21380

MYRTLE BEACH LUMBER COMPANY, INC., Appellant, v. Harry
G. WILLOUGHBY and Annette B. Willoughby, Respondents.

(274 S. E. (2d) 423)

*Joseph F. Singleton,* of *Cross & Singleton,* Conway, *for
appellant.*

*E. Windell McCrackin,* of *McCrackin & Barnett,* and
*Larry L. Hanna,* Myrtle Beach, *for respondents.*

January 20, 1981.

LITTLEJOHN, Justice:

The court is called upon to determine which of two innocent parties must lose approximately $21,000.00 representing materials and supplies furnished for the construction of a residence.

The defendants, Harry G. Willoughby and Annette B. Willoughby (owners), employed E. J. Antol Builders (contractor) to build a residence. The contractor negotiated with Myrtle Beach Lumber Co., Inc. (supplier) for materials to be used in construction of the house. The supplier, knowing that the contractor was financially unstable, required the contractor to have the owners sign a form which it, the supplier, customarily used. The form, as executed, follows:

"AUTHORIZATION TO MAKE CHECKS JOINTLY TO CONTRACTOR AND TO Myrtle Beach Lumber Company Please take notice:

This is to certify that I/We, *Harry G. and Annette B. Willoughby,* are the owners of a certain Lot located in *Horry* County. My contractor is *E. J. Antol Bldgs. Inc.*

In order to protect myself from liens for any material supplied by this company to improve my property and with the agreement and consent of my contractor, I hereby agree to make checks for *Myrtle Beach Lumber Co.* and the contractor jointly.

In Testimony Whereof, we have hereunto set our hands and seals this the *20th* day of *September, 1976.*

s/ Harry Willoughby   (SEAL)
s/ Bre Willoughby   (SEAL)

Witness

I, as Contractor, hereby consent to the checks to be made jointly to me and to *Myrtle Beach Lumber Co.* for the bills.

s/ E. J. Antol   (SEAL)
Contractor

Witness"

The contractor obtained the owners' signatures and returned the form to the supplier, which then furnished materials from approximately September 20, 1976, to completion of the house. There was no contact whatever between supplier and the owners until about April of 1977.

The owners financed the residence through Coastal Federal Savings and Loan Association in the amount of $48,000.00. As the work progressed, the lender supplied six checks (the last on January 31, 1977), payable to both the contractor and the owners. The owners endorsed all of the checks to the contractor and by so doing paid for the completed project. While monthly bills were submitted by the supplier to the contractor, no notice of any kind was given to the owners or to the lender of the indebtedness being incurred by the contractor for materials used. During the entire time of construction, the contractor was falsely reporting to the supplier that no payments had been received.

The supplier obtained an uncollectible judgment against the contractor and then initiated this action against the owners for breaching the contract set out above, alleging a loss in the amount of approximately $21,000.00.

The issues were tried before the master-in-equity, who recommended that the supplier's complaint be dismissed and that judgment be entered in favor of the owners. Exceptions were taken to the report, and the trial judge confirmed the master's report. The supplier filed this appeal. We affirm.

The testimony submitted to the master and to the judge was supplied by three witnesses: (1) a Mr. West, represen-

tative of the lender, (2) a Mr. Enter, representative of the supplier, and (3) Harry G. Willoughby, representing the owners.

The testimony of Mr. West is of no real consequence.

It was the testimony of Mr. Enter, for the supplier, that he did not see the owners at the time the agreement was signed, or make any contact with them whatsoever until the house was completed and the owners were moving in. He said that he failed to concern himself with the matter because he was relying upon the contractor's representations and because he had the agreement signed by the parties. He admitted that no notice was given to the owners or to the lender such that either might have done something to prevent the unfortunate situation which developed.

Owner Willoughby testified that he was unaware of the contractor's financial problems and that had he known that the supplier was not being paid, he would have seen to it that they got their money.

It is obvious that we have two innocent parties involved, one of whom must lose. When one of two innocent parties must suffer, the brunt should fall upon the one most responsible for the problem which developed. The unfortunate situation grows largely out of the ambiguous agreement prepared and submitted to the parties by the supplier. A study of the instrument makes understandable a layman's (owner's) difficulty in knowing what, if anything, to do under the circumstances. It is entitled "Authorization To Make Checks Jointly To Contractor and to Myrtle Beach Lumber Company." It is obviously the contractor's authorization because it is the contractor that is authorizing joint checks which normally would be payable to the contractor alone. The supplier knew that the contractor was financially unstable; the owners were not aware of this fact. The owners are laypeople, obviously unversed in dealing with housebuilding

contracts. Although the instrument indicates that its purpose was to protect the owners from liens, in truth its purpose was to protect the supplier in the collection of accounts from an insolvent contractor. Both the supplier and the contractor knew this to be true, but such was concealed from the owners, or at least such does not appear on the face of the instrument.

What duty did the instrument impose upon the supplier, upon the contractor, and upon the owners? The evidence does not support the inference that it was ever intended by the parties that the full amount of all checks due the contractor would be made payable to both the contractor and this one supplier. The supplier was furnishing only a portion of the materials and none of the labor needed by the contractor to build the house. In construing an agreement, consideration should be given to all of the verbiage. That portion of the agreement signed by the contractor reads as follows:

"I, as Contractor, hereby consent to the checks to be made jointly to me and to *Myrtle Beach Lumber Co. for the bills.*" (Emphasis added.)

"For the bills" obviously refers to bills owed to the supplier. If the supplier was depending upon the owners (which it obviously was) to pay the bills with their checks, it was the duty of the supplier to furnish them with the bills. The supplier simply did not bill the parties from whom it was expecting payment. We agree with the master's report, confirmed by the judge, wherein the master held:

"While the Contract does not expressly state that Plaintiff would furnish statements to the Defendants, nevertheless, it is implicit therein that this be done in order for Defendants to know the amount of the checks to be written."

Only the supplier and the contractor were aware of the amount due the supplier. Only the contractor and the supplier knew that the supplier was not being paid periodically.

The supplier's unfortunate situation could have been prevented completely if copies of the monthly statements had been sent to the owners. The supplier must have known, or certainly should have known, that a contractor whose financial situation was unstable was drawing money from the lender between September 20, when the house was commenced, and the following April, when the house was completed.

The form agreement used by the supplier is subject to interpretation. It is generally held that an ambiguity in a written contract should be construed most strongly against the drafters. We quote, with approavl, the following from 17A C. J. S. *Contracts* § 324:

"[A]mbiguous language in a contract should be construed liberally and most strongly in favor of the party who did not write or prepare the contract and is not responsible for the ambiguity; and any ambiguity in a contract, doubt, or uncertainty as to its meaning should be resolved against the party who prepared the contract or is responsible for the verbiage.

The reason for the rule of strict construction against the party preparing the contract is that one who speaks or writes can, by exactness of expression, more easily prevent mistakes in meaning more than one with whom he is dealing, and that he who has brought the agreement into existence and is thus primarily responsible for its inadequacy should justly suffer for its shortcomings."

The form instrument used by the supplier in this case, under the facts and circumstances disclosed by the evidence, simply does not serve the purpose intended by the supplier.

The order of the lower court is

Affirmed.

LEWIS, C. J., and NESS, GREGORY and HARWELL, JJ., concur.