494 S.E.2d 465

**Alirezia REYHANI, Respondent,**

v.

**STONE CREEK COVE CONDOMINIUM II HORIZONTAL PROPERTY REGIME, Louis T. Smiles and Debra L. Smiles, Georgia Lou Huff, Rebecca M. Chamblee and Jones M. Chamblee, Ward Van Duzer and Judith Van Duzer, Keith Holmquist and Shirley M. Holmquist, Elaine W. Epstein, Julia K. Mohney, John J. Cannon and Janet H. Cannon, Russell K. Street, S.S. Smith Lumber Co., Inc., Louise R. Floyd and John C. Floyd, Claude D. Calloway and Dianna C. Calloway, T.G. Lekorenos and Barbara M. Lekorenos, G.E. Moore, Jr. and James A. Barmore, Norman J. Bundy and Norma K. Bundy, and James S. Belk, and Stone Creek Cove Homeowners' Association, a Nonprofit Corporation, Appellants.**

No. 2763.

Court of Appeals of South Carolina.

Heard Nov. 5, 1997.
Decided Dec. 8, 1997.
Rehearing Denied Jan. 22, 1998.

Harold P. Threlkeld, Anderson, for appellants.

John J. Stathakis, of Epps, Nicholson & Stathakis; and Karl L. Kenyon, of Kenyon & Lusk, Anderson, for respondent.

CURETON, Judge:

Respondent, Alirezia Reyhani (Reyhani), sought a declaration that he possesses fee simple title to a lot of land. The

appellants, which include property owners in the Stone Creek Cove Condominium II Horizontal Property Regime, the homeowners association, and the regime itself ("Regime II"), counterclaimed seeking a declaration that they have fee simple title to the same land. The master to whom this action was referred, found Reyhani owned the property in fee simple. We reverse and remand.

The sole issue presented on appeal is whether the master erred in finding that Reyhani has fee simple title to the property.

### *Facts*

The property to which Reyhani claims title, consists of 1.076 acres in a residential development on Lake Hartwell called Stone Creek Cove. Stone Creek Cove was a subdivision development consisting of 175 acres. The plan of development included both single family residential lots and condominium units. In March 1974, the original developer filed a Master Deed in which he submitted 5.526 acres of that land to Regime II, one of several Horizontal Regimes in the development. The 1.076 acres in dispute is part of the 5.526 acres. As best we can tell from the sparse record before us, Regime II was to contain 38 units, to be developed in three phases. Only sixteen condominium units have been built in the regime, all apparently in Phase One.

NCNB held a mortgage on the entire 175 acres, less the units that had been released from its mortgage. It foreclosed on its mortgage which resulted in extensive litigation. On May 20, 1977, Judge Rodney Peeples issued a final order concluding the litigation. Under the terms of his order, and as to Regime II, the Master Deed was to be amended to incorporate the provisions of an agreement entered into by NCNB and the homeowners association. Of particular interest is paragraph 9(b) of the agreement, which provides:

All owners of units in this Property Regime will consent to an amendment of the Master Deed, to provide for an increase of the percentage interest of each unit, such that all properties and improvements dedicated under the Master Deed are owned by the existing sixteen units which have been completed in the Regime. Percentages will be based

on the evaluation points granted each of the existing units by the Master Deed. The amendment will also grant to [NCNB] the assignable right at any time and from time to time prior to April 1, 1982, to elect to proceed with the development of Phases 2 and 3 of the Regime, Phase 2 to consist of a maximum of twelve units and Phase 3 a maximum of ten units.... In the event development is not commenced by the time indicated above, it will be conclusively presumed that the right of further development has been abandoned, and the property dedicated as to any phase not elected will constitute general common elements of the Regime. In the event there is an election to construct additional units, the percentage interest appurtenant to each unit will automatically change to the percentage interest in said general common elements and limited common elements to set forth in the amendment to be recorded at the time of the election, within the limitations set forth for the additional phases.

After entry of Judge Peeples's order, the tract consisting of approximately 171 acres was sold at a public sale to NCNB.

While the record does not contain the building or plot plans showing the location of buildings, other improvements and common areas, the Master Deed does state that the buildings and common elements are fully shown on two exhibits attached to the Master Deed. Additionally, the record does not contain the Amended Master Deed, but the appellants refer to it. Moreover, the master's order concludes there was full compliance with the order of Judge Peeples, which would include the requirement that the Master Deed be amended to incorporate pertinent provisions of the agreement referred to above. There has been no appeal from that finding in the master's order.

### *Law/Analysis*

 Actions for declaratory judgment are neither legal nor equitable; instead, the nature of the action depends on the underlying issues. *Felts v. Richland County*, 303 S.C. 354, 400 S.E.2d 781 (1991). The interpretation of a deed is an equitable matter; therefore, this court reviews the evidence to determine the facts in accordance with our view of the preponderance of the evidence. *Heritage Federal Sav. & Loan v.*

*Eagle Lake & Golf,* 318 S.C. 535, 458 S.E.2d 561 (Ct.App.1995) (case depended mostly on interpretation of master deed and allied documents). Moreover, the master saw his function in the matter as "primarily an interpretation of these documents that have been submitted." As voluntary contracts, restrictive covenants will be enforced according to their terms unless they are indefinite or contravene public policy. 17 S.C.Juris. *Covenants* § 100 (1993) (citing *Sea Pines Plantation Co. v. Wells,* 294 S.C. 266, 363 S.E.2d 891 (1987)).

Horizontal property regimes are governed by the South Carolina Horizontal Property Act. S.C.Code Ann. § 27–31–10–300 (Rev.1991 & Supp.1996). Section 27–31–20 defines "general common elements" in part as "[t]he land whether leased or in fee simple and whether or not submerged on which the apartment or building stands" and "all other elements of the property rationally of common use or necessary to its existence, upkeep, and safety." Section 27–31–110 requires a plot or building plan be filed with the master deed showing all improvements and common elements.

The appellants argue that they have title to the property as a common element through the Master Deed and nothing which occurred after the recordation of the Master Deed, including the judge's order and the agreement, divested them of that ownership. They also argue the development rights to the property expired under the terms of the amended Master Deed, and therefore, the property became a general common element of the Regime. Thus, they contend the property in question could not have been sold as separate property of the developer or its successor. They cite *Heritage Federal Sav. & Loan v. Eagle Lake & Golf,* 318 S.C. 535, 458 S.E.2d 561 (Ct.App.1995) (Clubhouse appeared in legal description of property submitted to regime as a common element; one plat showed it as an improvement; therefore, clubhouse was a common element.).

Reyhani cites language in paragraph 8 of the 1977 agreement, which allowed NCNB "the assignable right to further develop the properties being foreclosed on" and the right to file a supplemental or amended plat of the subdivision:

by which certain portions of the property being foreclosed against which are now designated as single family lots may

be converted to multi-family properties and properties which have not been developed, however identified on the plat, may be developed for either single family or multi-family purposes.

Reyhani also argues he acquired his land in accordance with development permitted by the provisions of the 1977 agreement and Judge Peeples' order. Reyhani also points to the fact that the Board of Directors of the homeowner's association was aware of the transfer of the property to him and acknowledged the same.

## *Discussion*

The appellants are correct that once common elements are set aside and vested in the co-owners, such co-owners may not be unilaterally deprived of their interests in the common elements by the actions of the developer. S.C.Code Ann. §§ 27–31–70, –130 (Rev.1991 & Supp.1996); 4 S.C.Juris. *Condominiums* § 18 (1991). The record before us contains the Master Deed showing the property in question was submitted to the regime. The record, however, does not contain the plot or building plans that show the location of the condominium units and common elements. The Master Deed, however, defines common elements as "all of the project except all units." Additionally, the Master Deed defines the "project" as "the real property and the buildings and other improvements on the real property." Accordingly, the appellants are correct that at the time the regime was created, the entire 5.526 acre tract was either designated as one of 38 condominium units or as a common element. The effect of the 1977 agreement and Judge Peeples's order thus becomes the question at hand.

The appellants argue the agreement and order have no effect. On the other hand, Reyhani argues and the master held that the agreement and order are the basis for his fee simple title to the lot. Reyhani specifically claims that paragraph 8 of the above mentioned agreement gave his predecessors the right to further develop the property at issue. From a fair reading of paragraph 8, we are convinced that it does not apply to the regime in question. That provision refers to those portions of the 171 acre tract then "designated as single family lots and properties that have not been developed." The

38 condominium units described in the Master Deed as constituting the regime in issue are neither single family lots nor undeveloped properties.[1] Moreover, once designated as condominium units, such units may not be converted by a developer into single family residential lots by the simple act of filing an amended plat. Manifestly, this paragraph must necessarily have referred to portions of the 171 acre tract that had not been submitted to this condominium regime. Finally, an interpretation of paragraph 8 in the manner suggested by Reyhani would conflict with the more specific provisions of paragraph 9(b) which relates specifically to the future development of Phases 2 and 3 of the regime. The purpose of all rules of contract construction is to ascertain the intention of the parties and that intention must be gathered from the entire agreement and not from any one particular phrase thereof. *Thomas–McCain, Inc. v. Siter,* 268 S.C. 193, 232 S.E.2d 728 (1977). Documents will be interpreted so as to give effect to all of their provisions, if practical. 17A Am. Jur.2d *Contracts* § 385 (1991). Here, we think paragraphs 8 and 9 of the agreement can be reconciled by applying paragraph 8 to the future development of the entire subdivision except for the established regimes, and paragraph 9(b) to the future development of Phases 2 and 3 of the regime in question.

At the time of the agreement, Phase One of the regime had been built. We interpret paragraph 9(b), as the parties' agreement that Phases 2 and 3 could be completed by NCNB, its successors and assigns, provided the same was done by April 1, 1982. The provision further states that in the event development is not "commenced" by April 1, 1982, development rights would be "conclusively presumed" to have been abandoned and the properties dedicated to such would become common elements of the regime.

The appellants also argue that "[b]y the terms of the Master Deed, as amended, development rights in the Condominium property has(sic) expired." Whether or not Reyhani's prede-

---

1. The 1977 agreement defines the property involved as consisting of "lots, condominium units, undeveloped property, three condominium regimes, certain common properties, and various improvements." Further, paragraph 8 is captioned "Further Subdivision Development," and thus it applies to the whole 175 acre planned subdivision, not just the one regime in question.

cessors in interest complied with paragraph 9(b) and commenced "development" of Phases 2 and 3 by April 1, 1982 depends on what the agreement means by the term "development." We are assisted in this determination to some extent by paragraph 10(f) of the agreement which states:

Property, including present undeveloped lots, which is developed multi-family will become developed property at such time as all improvements are completed and ready for occupancy, each residential unit to become an assessable unit.

As to the condominium units in question, it is clear that the completion of development of them includes the building of the condominium structures and other improvements. Conversely, the commencement of development would consist of any substantial work directed toward the building of the structures. *See Friarsgate, Inc. v. Town of Irmo,* 290 S.C. 266, 349 S.E.2d 891 (Ct.App.1986). There was testimony by the president of the homeowners' association that concrete was poured at some point, but we are given no hint as to where it was poured or the date it was done.

■ At this point we would ordinarily remand to the trial court for a factual development of the issue of when and if development has been commenced. We need not do that here because, in any event, Reyhani does not base his ownership rights on compliance with paragraph 9(b) of the 1977 agreement. Rather he bases his ownership rights on compliance with paragraph 8(a) of the 1977 agreement and a June 17, 1988 agreement between his predecessor Marassett Limited Partnership and the homeowners' association. The 1988 agreement does not indicate the parties agreed to a conversion of any portion of the land designated as condominium units or common elements in Phases 2 and 3 to single family residential lots; in fact, at that time Marassett was only negotiating to purchase the remaining 22 condominium units in Phases 2 and 3 which the parties referred to as "developed properties." While there is some suggestion that Marassett may have intended after acquisition to convert some of the 22 units in Phases 2 and 3 into "building lots," the agreement, nevertheless, concludes with the understanding that it "shall in no way affect the terms, conditions and provisions as set forth in" Judge Peeples's 1977 order and the 1977 agreement incorpo-

rated therein. We therefore hold that the 1988 agreement, which was not assented to by the condominium unit owners, nor effected by an amendment to the Master Deed, could not have given Marassett or its successors in interest the right to combine any of the 22 condominium units or common elements of the regime into the 1.076 acre tract [2] now claimed to be owned by Reyhani.

Accordingly, we conclude the master erred in holding that compliance with paragraph 8(a) of the 1977 agreement, as incorporated into Judge Peeples order, gave Reyhani fee simple title to the 1.076 acre tract in question. The order of the trial court is therefore reversed and this matter remanded to the trial court for entry of an order consistent with this opinion.

**REVERSED AND REMANDED.**

HOWELL, C.J. and HOWARD, J., concur.

---

**2.** Apparently, Reyhani's lot was carved from the 5.526 tract in 1989.