665 S.E.2d 618

**Charles WARD and Robby Hodge, d/b/a
R&B Amusements, Appellants,**

**v.**

**WEST OIL COMPANY, INC., d/b/a
Markette Stores, Respondent.**

**No. 4389.**

Court of Appeals of South Carolina.

Heard May 6, 2008.
Decided May 12, 2008.
Rehearing Denied Aug. 25, 2008.

---

228

230

Charles E. Carpenter, Jr. and Carmen V. Ganjehsani, of Columbia, M.M. Weinberg, Jr., of Sumter, and Kenneth D. Baker, of Darlington, for Appellants.

Martin S. Driggers, Jr. and William R. Calhoun, Jr., of Columbia, for Respondent.

ANDERSON, J.

Charles Ward and Robby Hodge, d/b/a R&B Amusements, appeal the Special Referee's award of $5,067.31 in their favor in a breach of contract action. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

### I. Initial Meeting

Charles Ward (Ward) and Robby Hodge (Hodge) operated a gaming business known as R&B Amusements (R&B). They desired to place their pull tab machines in convenience stores owned by West Oil Company, Inc. (West Oil). The machines sold tickets, called "Pots of Gold," with potential for winning

prizes. On September 11, 2001, Ward and Hodge met with Lex West, Jr. (West), owner of West Oil, and Camp Seegars (Seegars), an employee of West Oil, to discuss the possibility of placing the machines. Seegars was West Oil's Director of Operations and oversaw its twenty-four convenience stores. This was the first time the parties met; they had never done business together before.

R&B gave West Oil an overview of their machines and presented West Oil with a form contract, entitled "Exclusive Agreement," that R&B obtained from its machine supplier. The typewritten contract consisted of eleven paragraphs. West Oil agreed to place the machines initially at four of their stores. The terms of the agreement were negotiated at this meeting. West Oil expressed its desire to reduce the term of the agreement from the three years R&B proposed to one year and to collect a $500 placement fee from R&B for each machine situated in its stores. R&B's typical agreement was to split the profits, defined as the total money taken in by the machines less the payouts and cost of the tickets from the manufacturer, with the location owner. West Oil wanted R&B to absorb the cost of the tickets in the machines in its stores. R&B was agreeable to the modifications because of their desire to place their machines in such a large operator's stores.

There were some discussions regarding termination of the contract. West Oil contends it wanted the ability for either party to terminate the contract at will. At trial, Seegars testified that West Oil "wanted a way out because what if down the road they didn't like us or we didn't like them. That was put into that clause." Both parties understood the impending arrival of the South Carolina Education Lottery was a concern to West Oil, and it did not want the presence of R&B's machines to jeopardize its ability to become a lottery retailer. R&B advances they intended for West Oil to be able to terminate the contract only if their machines prohibited West Oil from selling lottery tickets.

## II. Execution of Agreement

Two days later, on September 13, 2001, Ward, Hodge, and Seegars met again. West did not attend this meeting, so

Seegars alone represented West Oil. R&B brought a revised, typed contract. The parties do not dispute that their agreement was for R&B to pay West Oil a $500 placement fee for each machine. The parties were to evenly split the profits (total money taken in by the machine less the payouts made by West Oil), and R&B was to absorb the costs of the tickets. The revised contract was for a one year term.

The revised contract contained no language allowing termination of the agreement if the relationship between the parties was no longer amicable. The typewritten contract R&B presented to West Oil on September 13 included the following paragraph:

7. In the event of any breach of this Agreement, it is recognized by both parties that remedies at law are inadequate given the highly competitive nature of this industry, and the difficulty of finding alternative locations not committed to existing agreements. OWNER further acknowledges the unique nature of the location. OWNER further acknowledges that the loss of this location will result in irreparable harm to R&B. As a result, the parties agree that either party may, without notice to the other party, petition in court of competent jurisdiction and obtain a restraining order and/or injunction requiring compliance with the terms of this Agreement. Notwithstanding the forgoing, in the event of a breach, in addition to any other remedy available, R&B may elect to terminate this Agreement and remove all game promotions materials and equipment without interference from OWNER and shall be entitled to liquidated damages in an amount equal to R&B's highest weekly share of the net proceeds prior to said breach, multiplied by the number of weeks remaining in the unexpired term of this Agreement.

Seegars wrote an additional provision (the Addition) at the top of the contract:

Addition * In event of contract termination up front placement money will be re-imbursed [sic] at pro-rated time with no penalties to either party of this contract. This is added this day September 13th [sic] 2001[sic]

*CS RH CW*

Seegars, Hodge, and Ward each initialed below the hand-written addition. All three signed the bottom of the contract. The contract originally specified four store locations where machines were to be placed. The machines performed well, and the parties agreed orally to place the machines in more stores over time. Eventually, West Oil authorized the placement of machines in thirteen additional stores.

## III. Ticket Sales

Initially, each ticket machine held a total of $4,800 worth of "red" tickets at a time. When the red tickets sold out, R&B would remove the money, pay the portion due to West Oil, and refill the machine with red tickets. In late 2001, R&B approached Seegars about changing the game from the red tickets to new "green" tickets. Seegars hesitated because West Oil's accounting system was programmed for the red tickets, but R&B insisted the green tickets would be more profitable for both R&B and West Oil. Seegars allowed the green tickets to be placed in one store in Bishopville. West Oil contends the change to the new game was only authorized for that one store, and R&B posit the contract gives them exclusive authority to decide what games to place in their machines. The contract states "R&B shall exclusively supply to OWNER any and all game promotions materials equipment for and upon the premises, including but not limited to, contests, games of chance, sweepstakes, prizes, tickets, ticket dispensing equipment, advertisement materials, and product services related to, or in connection with, such game promotions . . . ."

## IV. Contract Termination and Subsequent Proceedings

R&B began adding the new green tickets to store locations other than the one store in Bishopville. According to West Oil, this change was not authorized. Seegars became upset when he learned of this at a meeting of store supervisors. West asked Seegars if he authorized placement of the new game. Seegars informed West that he did so for only one store, and West instructed him to leave the meeting to phone R&B and direct them to remove their machines from all West Oil stores.

R&B complied with West Oil's request and removed the machines. R&B counted the money in each machine and determined how much the partially played deck of cards had paid out. R&B compensated West Oil for the payouts and their share of the profits from each machine.

R&B filed a complaint asserting a breach of contract claim against West Oil seeking over $800,000 in damages. West Oil filed a counterclaim against R&B alleging breach of contract for selling products not authorized under the contract. The matter was referred to a special referee who conducted a trial. The special referee determined:

> The court finds that a written, enforceable contract existed for the initial four ticket machines. That contract was terminated. Under the handwritten Addition to the contract: "In the event of contract termination, up front placement money will be reimbursed at pro-rated time with no penalties to either party of this contract." (ex. A:1) The up front placement money was $500 per machine. This also applied for the thirteen additional machines that were added at other locations. Therefore, the plaintiffs initially paid the defendants $8,500 in up front placement money. Under the plaintiff's calculation, the machines were in place for twenty-one weeks. Therefore, the plaintiffs are entitled to be reimbursed the pro-rated portion of the up front placement money, which equals $5,067.31. [footnote omitted]

R&B filed a motion to alter or amend judgment pursuant to Rule 59(e), SCRCP, which was denied.

### ISSUES

1. Did the special referee commit an error of law in the construction of the contract?

2. Is there any evidence that reasonably supports the decision of the special referee?

### STANDARD OF REVIEW

"An action for breach of contract seeking money damages is an action at law." *Sterling Dev. Co. v. Collins*, 309 S.C. 237, 240, 421 S.E.2d 402, 404 (1992); *Moore v. Crowley & Associates, Inc.*, 254 S.C. 170, 172, 174 S.E.2d 340, 341 (1970);

*Ellie, Inc. v. Miccichi,* 358 S.C. 78, 89, 594 S.E.2d 485, 491 (Ct.App.2004); *R & G Constr., Inc. v. Lowcountry Reg'l Transp. Auth.,* 343 S.C. 424, 430, 540 S.E.2d 113, 117 (Ct.App. 2000). Generally, an action to construe a contract is one at law. *Patricia Grand Hotel, LLC v. MacGuire Enter., Inc.,* 372 S.C. 634, 638, 643 S.E.2d, 692, 694 (Ct.App.2007); *see Jacobs v. Service Merch. Co.,* 297 S.C. 123, 127, 375 S.E.2d 1, 3 (Ct.App.1988) (noting an action to construe an unambiguous written contract is one at law); *see also Barnacle Broad., Inc. v. Baker Broad., Inc.,* 343 S.C. 140, 146, 538 S.E.2d 672, 675 (Ct.App.2000).

■ "In an action at law, on appeal of a case tried without a jury, the findings of fact of the judge will not be disturbed upon appeal unless found to be without evidence which reasonably supports the judge's findings. . . . The judge's findings are equivalent to a jury's findings in a law action." *Townes Assocs.,* 266 S.C. at 86, 221 S.E.2d at 775; *accord Patricia Grand Hotel,* 372 S.C. at 638, 643 S.E.2d at 694; *Cohens v. Atkins,* 333 S.C. 345, 347, 509 S.E.2d 286, 288 (Ct.App.1998); *Small v. Pioneer Mach., Inc.,* 329 S.C. 448, 461, 494 S.E.2d 835, 841 (Ct.App.1997). "[Q]uestions regarding the credibility and the weight of evidence are exclusively for the trial judge." *Golini v. Bolton,* 326 S.C. 333, 342, 482 S.E.2d 784, 789 (Ct.App.1997).

■ A special referee, under Rule 53(c), SCRCP, "shall exercise all power and authority which a circuit [court] sitting without a jury would have in a similar manner." Thus, our review of a special referee's decision is limited to the correction of errors of law, and this court will not disturb the referee's factual findings if supported by any evidence. *Jones v. Daley,* 363 S.C. 310, 314, 609 S.E.2d 597, 599 (Ct.App.2005).

## *LAW/ANALYSIS*

### I. West Oil's Right to Terminate the Contract at Will

R&B avers the special referee erred in construing the Addition to the contract so as to allow West Oil to terminate the contract at will. Specifically, R&B maintains the special referee contravened several cardinal principles of contract law by interpreting the Addition so as to render meaningless the

primary contractual rights and duties of the parties. We disagree.

## A. Unambiguous vs. Ambiguous Contract

R&B first argues the special referee erred by failing to exclusively look to the language of the clear and unambiguous contract in ascertaining the parties' intent. We disagree.

 If a contract's language is plain, unambiguous, and capable of only one reasonable interpretation, no construction is required and its language determines the instrument's force and effect. *Jordan v. Security Group, Inc.,* 311 S.C. 227, 230, 428 S.E.2d 705, 707 (1993); *Blakeley* at 72, 221 S.E.2d at 769. "Where an agreement is clear and capable of legal interpretation, the courts only function is to interpret its lawful meaning, discover the intention of the parties as found within the agreement, and give effect to it." *Ellie, Inc. v. Miccichi,* 358 S.C. 78, 93, 594 S.E.2d 485, 493 (Ct.App.2004) (quoting *Heins v. Heins,* 344 S.C. 146, 158, 543 S.E.2d 224, 230 (Ct.App.2001)). However, where an agreement is ambiguous, the court should seek to determine the parties' intent. *Smith–Cooper v. Cooper,* 344 S.C. 289, 295, 543 S.E.2d 271, 274 (Ct.App.2001); *Prestwick Golf Club, Inc. v. Prestwick Ltd. P'ship,* 331 S.C. 385, 390, 503 S.E.2d 184, 187 (Ct.App.1998).

 "A contract is ambiguous when it is capable of more than one meaning or when its meaning is unclear." *Ellie* at 94, 594 S.E.2d at 493; *accord Bruce v. Blalock,* 241 S.C. 155, 160, 127 S.E.2d 439, 441 (1962); *Hawkins v. Greenwood Dev. Corp.,* 328 S.C. 585, 493 S.E.2d 875 (Ct.App.1997). "[A]n ambiguous contract is one capable of being understood in more senses than one, an agreement obscure in meaning, through indefiniteness of expression, or having a double meaning." *Carolina Ceramics, Inc. v. Carolina Pipeline Co.,* 251 S.C. 151, 155–56, 161 S.E.2d 179, 181 (1968) (citation omitted).

 The construction of a clear and unambiguous contract is a question of law for the court. *S.C. Dep't of Natural Resources v. Town of McClellanville,* 345 S.C. 617, 550 S.E.2d 299 (2001); *S. Atl. Fin. Servs., Inc. v. Middleton,* 349 S.C. 77, 80–81, 562 S.E.2d 482, 484–85 (Ct.App.2002), *aff'd as modified,* 356 S.C. 444, 590 S.E.2d 27 (2003); *United Dominion Realty*

*Trust, Inc. v. Wal–Mart Stores, Inc.,* 307 S.C. 102, 105, 413 S.E.2d 866, 868 (Ct.App.1992). Whether a contract's language is ambiguous is a question of law. *S.C. Dep't of Natural Resources v. Town of McClellanville,* 345 S.C. 617, 550 S.E.2d 299 (2001); *S. Atl. Fin. Servs.,* 349 S.C. at 80–81, 562 S.E.2d at 484–85; *United Dominion Realty Trust,* 307 S.C. at 105, 413 S.E.2d at 868. A contract is ambiguous when the terms of the contract are inconsistent on their face, or are reasonably susceptible of more than one interpretation. *Hawkins v. Greenwood Dev. Corp.,* 328 S.C. 585, 592, 493 S.E.2d 875, 878 (Ct.App.1997). "A contract is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Id.* "Once the court decides that the language is ambiguous, evidence may be admitted to show the intent of the parties. The determination of the parties' intent is then a question of fact for the jury." *Id.* at 592, 493 S.E.2d at 879; *see also Charles v. B & B Theatres, Inc.,* 234 S.C. 15, 18, 106 S.E.2d 455, 456 (1959) ("[W]hen the written contract is ambiguous in its terms, ... parol and other extrinsic evidence will be admitted to determine the intent of the parties.") (citation omitted); *Ecclesiastes Prod. Ministries v. Outparcel Assocs., LLC,* 374 S.C. 483, 500, 649 S.E.2d 494, 503 (Ct.App.2007).

■ The court must enforce an unambiguous contract according to its terms, regardless of the contract's wisdom or folly, or the parties' failure to guard their rights carefully. *Ellis v. Taylor,* 316 S.C. 245, 248, 449 S.E.2d 487, 488 (1994); *Jordan v. Security Group, Inc.,* 311 S.C. 227, 230, 428 S.E.2d 705, 707 (1993).

■ The parties signed the agreement and separately initialed the Addition at the top of the contract. R&B now professes the Addition contravenes the terms of the contract so as to render meaningless the primåry contractual rights and duties of the parties. R&B's understanding with regards to the operative language used in the Addition is contrary to the understanding of West Oil. Hence, the operative language used in the Addition creates an apparent ambiguity as to the

termination of the contract. Accordingly, the special referee properly allowed extrinsic evidence in ascertaining the parties' intent.

## B. Intent of the Parties

R&B asserts the special referee erred by failing to interpret the contract according to the intention of the parties at the time the agreement was entered. We disagree.

A court must construe an ambiguous contract in a manner that gives effect to all of its provisions, if the court reasonably may do so. *Osteen v. T.E. Cuttino Const. Co.*, 315 S.C. 422, 427, 434 S.E.2d 281, 284 (1993). An agreement capable of an interpretation which will make it valid will be given such an interpretation if the agreement is ambiguous. *Id.* at 428, 434 S.E.2d at 284; *Romanus v. Biggs*, 214 S.C. 145, 51 S.E.2d 503 (1949).

In construing a contract, the primary objective is to ascertain and give effect to the intention of the parties. *Ecclesiastes Prod. Ministries*, 374 S.C. at 497, 649 S.E.2d at 501; *S. Atl. Fin. Servs.*, 349 S.C. at 80–81, 562 S.E.2d at 484–85; *accord D.A. Davis Constr. Co., Inc. v. Palmetto Props., Inc.*, 281 S.C. 415, 418, 315 S.E.2d 370, 372 (1984); *Williams v. Teran, Inc.*, 266 S.C. 55, 59, 221 S.E.2d 526, 528 (1976); *RentCo., a Div. of Fruehauf Corp. v. Tamway Corp.*, 283 S.C. 265, 267, 321 S.E.2d 199, 201 (Ct.App.1984). "Contracts should be liberally construed so as to give them effect and carry out the intention of the parties." *Mishoe v. Gen. Motors Acceptance Corp.*, 234 S.C. 182, 188, 107 S.E.2d 43, 47 (1958).

The parties' intention must, in the first instance, be derived from the language of the contract. *Schulmeyer v. State Farm Fire & Cas. Co.*, 353 S.C. 491, 495, 579 S.E.2d 132, 134 (2003); *C.A.N. Enters., Inc. v. S.C. Health & Human Servs. Fin. Comm'n.*, 296 S.C. 373, 377, 373 S.E.2d 584, 586 (1988) ("In construing terms in contracts, this Court must first look at the language of the contract to determine the intentions of the parties."); *Superior Auto. Ins. Co. v. Maners*, 261 S.C. 257, 263, 199 S.E.2d 719, 722 (1973); *Jacobs v. Service Merch. Co.*, 297 S.C. 123, 375 S.E.2d 1 (Ct.App.1988). To discover the intention of a contract, the court must first look

to its language—if the language is perfectly plain and capable of legal construction, it alone determines the document's force and effect. *Superior Auto. Ins. Co. v. Maners*, 261 S.C. 257, 263, 199 S.E.2d 719, 722 (1973). "Parties are governed by their outward expressions and the court is not at liberty to consider their secret intentions." *Blakeley v. Rabon*, 266 S.C. 68, 73, 221 S.E.2d 767, 769 (1976); *Ellie*, 358 S.C. at 93–94, 594 S.E.2d at 493–94; *accord Kable v. Simmons*, 217 S.C. 161, 166, 60 S.E.2d 79, 81 (1950).

The parties' intention must be gathered from the contents of the entire agreement and not from any particular clause thereof. *Thomas–McCain, Inc. v. Siter*, 268 S.C. 193, 197, 232 S.E.2d 728, 729 (1977); *see also Barnacle Broad., Inc. v. Baker Broad., Inc.*, 343 S.C. 140, 147, 538 S.E.2d 672, 675 (Ct.App.2000) ("The primary test as to the character of a contract is the intention of the parties, such intention to be gathered from the whole scope and effect of the language used."). "Documents will be interpreted so as to give effect to all of their provisions, if practical." *Reyhani v. Stone Creek Cove Condominium II Horizontal Property Regime*, 329 S.C. 206, 212, 494 S.E.2d 465, 468 (Ct.App.1997) (citing 17A Am. Jur.2d *Contracts* § 385 (1991)). "The courts, in attempting to ascertain this intention, will endeavor to determine, the situation of the parties, as well as their purposes, at the time the contract was entered." *Columbia East Assocs. v. Bi–Lo, Inc.*, 299 S.C. 515, 519–20, 386 S.E.2d 259, 261–62 (Ct.App.1989); *see Klutts Resort Realty, Inc. v. Down'Round Dev. Corp.*, 268 S.C. 80, 89, 232 S.E.2d 20, 25 (1977); *Bruce v. Blalock*, 241 S.C. 155, 161, 127 S.E.2d 439, 442 (1962); *Mattox v. Cassady*, 289 S.C. 57, 61, 344 S.E.2d 620, 622 (Ct.App.1986). "[By] doing so, the court is able to avail itself of the same light which the parties possessed when the agreement was entered into so that it may judge the meaning of the words and the correct application of the language." *Klutts*, 268 S.C. at 89, 232 S.E.2d at 25.

In *Brady v. Brady*, 222 S.C. 242, 72 S.E.2d 193 (1952), the South Carolina Supreme Court elucidated:

It is fundamental that in the construction of the language of a [contract], it is proper to read together the different provisions therein dealing with the same subject matter, and

where possible, all the language used should be given a reasonable meaning.

Agreements should be liberally construed so as to give them effect and carry out the intention of the parties. In arriving at the intention of the parties to a lease, the subject matter, the surrounding circumstances, the situation of the parties, and the object in view and intended to be accomplished by the parties at the time, are to be regarded, and the lease construed as a whole. Different provisions dealing with the same subject matter are to be read together. *Id.* at 246–47, 72 S.E.2d at 195.

■■ Incontrovertibly, the record evinces R&B's intent to include the handwritten termination provision as an additional term to the contract. R&B was aware of and agreed upon the remedies available under the handwritten termination provision. The inclusion of the Addition was discussed at the initial meeting between both parties, and the parties subsequently agreed to incorporate the handwritten provision and acknowledged its inclusion by separately initialing the Addition at the top of the Exclusive Agreement. Luculently, the record reflects R&B intended to include the Addition as an essential term of the underlying agreement. Ergo, the special referee did not err in failing to find otherwise.

### C. Parol Evidence

R&B maintains the special referee erred by allowing parol evidence to aid in the interpretation of the contract. We disagree.

■■■ "Where a contract is silent as to a particular matter, and ambiguity thereby arises, parol evidence may be admitted to supply the deficiency and establish the true intent." *Columbia East Assocs. v. Bi–Lo, Inc.,* 299 S.C. 515, 519–20, 386 S.E.2d 259, 261–62 (Ct.App.1989); *Wheeler v. Globe Rutgers Fire Ins. Co. of City of N.Y.,* 125 S.C. 320, 325, 118 S.E. 609, 610 (1923). Under the parol evidence rule, extrinsic evidence is inadmissible to vary or contradict the terms of a contract. *Penton v. J.F. Cleckley Co.,* 326 S.C. 275, 280, 486 S.E.2d 742, 745 (1997). "However, if a contract is ambiguous, parol evidence is admissible to ascertain the true meaning and intent of the parties." *Koontz v. Thomas,* 333

S.C. 702, 709, 511 S.E.2d 407, 411 (Ct.App.1999). An ambiguous contract is a contract capable of being understood in more than one way or a contract unclear in meaning because it expresses its purpose in an indefinite manner. *Klutts Resort Realty, Inc. v. Down'Round Dev. Corp.,* 268 S.C. 80, 89, 232 S.E.2d 20, 25 (1977).

█ The operative language used in the Addition creates an apparent ambiguity as to the termination of the contract. Accordingly, "parol evidence may be admitted to supply the deficiency and establish the true intent of the parties." *Columbia East Assocs.,* 299 S.C. at 519–20, 386 S.E.2d at 261–62. We rule the special referee did not err in allowing parol evidence to aid in the interpretation of the contract.

### D. Interpretation of the Contract

R&B posits the special referee erred in interpreting the contract as a whole by failing to give effect to all its provisions. We disagree.

██ In ascertaining the intention of a contract, the court must look to the contents of the entire agreement and not from any particular clause thereof. *Thomas–McCain,* 268 S.C. at 197, 232 S.E.2d at 729. "The primary test as to the character of a contract is the intention of the parties, such intention to be gathered from the whole scope and effect of the language used." *Barnacle Broad.,* 343 S.C. at 147, 538 S.E.2d at 675.

█ Where multiple documents form the essential terms of a contract, the "[d]ocuments will be interpreted so as to give effect to all of their provisions, if practical." *Reyhani v. Stone Creek Cove Condominium II Horizontal Prop. Regime,* 329 S.C. 206, 212, 494 S.E.2d 465, 468 (Ct.App.1997) (citation omitted). "[I]n the absence of anything indicating a contrary intention, where instruments are executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction, the courts will consider and construe the instruments together." *Klutts Resort Realty, Inc. v. Down'Round Dev. Corp.,* 268 S.C. 80, 89, 232 S.E.2d 20, 25 (1977). Furthermore, "where the instruments have not been executed simultaneously but relate to the same subject

matter and have been entered into by the same parties, the transaction comprising the contract will be considered as a whole." *Id.* As noted by our Supreme Court:

Construing contemporaneous instruments together means simply that if there are any provisions in one instrument limiting, explaining, or otherwise affecting the provisions of another, they will be given effect between the parties so that the whole agreement as actually made may be effectuated.

*Id.*

 The Addition can be interpreted in complete harmony with the other provisions of the Exclusive Agreement. The additional handwritten provision did not affect or confuse any of the other terms, as evidenced by the parties conduct prior to the contract's termination. The record indicates R&B was aware of and agreed upon the remedies available under the handwritten termination provision. To the extent the operative language used in the Addition conflicts with any portion of the contract, South Carolina law mandates the handwritten provision prevail. *See Hawkins v. Greenwood Dev. Corp.*, 328 S.C. 585, 593, 493 S.E.2d 875, 879 (Ct.App. 1997) ("Printed provisions of a contract should be harmonized, if possible, with handwritten ones. If there is an inconsistency between the two provisions, however, the handwritten provision prevails."). Hence, the special referee did not err in giving effect to the handwritten termination provision because the Addition was intended to serve as an essential term of the underlying agreement and is consistent with the other provisions provided therein.

## E. Interpretation of the Addition

 R&B asseverates the special referee erred by construing the Addition as an "escape clause" for West Oil. Particularly, R&B claims the operative language used in the Addition contradicts the terms of the contract creating an ambiguity which should be construed in R&B's favor. We disagree.

Ambiguous language in a contract should be construed liberally and most strongly in favor of the party who did not write or prepare the contract and is not responsible for the

ambiguity; and any ambiguity in a contract, doubt, or uncertainty as to its meaning should be resolved against the party who prepared the contract or is responsible for the verbiage.

*Myrtle Beach Lumber Co. v. Willoughby,* 276 S.C. 3, 8, 274 S.E.2d 423, 426 (1981); *see also Columbia East Assocs. v. Bi–Lo, Inc.,* 299 S.C. 515, 519–20, 386 S.E.2d 259, 261–62 (Ct.App. 1989) ("Where the contract is susceptible of more than one interpretation, the ambiguity will be resolved against the party who prepared the contract.").

While R&B correctly asserts any ambiguity in a contract should be resolved against the drafter, R&B waived any claim regarding the construction of ambiguities created by the additional termination provision. In the paragraph numbered ten in the Exclusive Agreement, "each party hereby waives the doctrine that an ambiguity should be construed and interpreted against the party that drafted this Agreement." The special referee did not err in construing the Addition against R&B.

## F. Plain and Ordinary Meaning

R&B challenges the special referee erred by failing to interpret the contract according to its plain and ordinary meaning. Specifically, R&B claims the special referee improperly construed the Addition by equating the meaning of "termination" with the meaning of "breach." We disagree.

When the language of a contract is clear, explicit, and unambiguous, the language of the contract alone determines the contract's force and effect and the court must construe it according to its plain, ordinary, and popular meaning. *Conner v. Alvarez,* 285 S.C. 97, 101, 328 S.E.2d 334, 336 (1985); *Moser v. Gosnell,* 334 S.C. 425, 430, 513 S.E.2d 123, 125 (Ct.App. 1999).

Contrary to R&B's contention, the language of the Addition expressly and unambiguously sets forth what will occur in the event of contract termination—not in the event of breach. Black's Law Dictionary defines "termination" as "the act of ending something." *Black's Law Dict.* (8th ed.2004). This was the same operative term used in the handwritten

provision expressly consented to by R&B. R&B's express consent to the Addition further reflects R&B's acknowledgment and understanding of the terms therein. Consequently, R&B cannot claim the special referee improperly construed "termination" as employed in the Addition. The special referee did not err in interpreting the contract as terminated rather than breached based upon the plain and ordinary meaning of the Addition's operative language.

### G. Good Sense Meaning

R&B maintains the special referee erred in interpreting the contract according to its "good sense" meaning. We disagree.

Common sense and good faith are the leading touchstones of construction of the provisions of a contract; where one construction makes the provisions unusual or extraordinary and another construction which is equally consistent with the language employed, would make it reasonable, fair and just, the latter construction must prevail.

*C.A.N. Enters., Inc. v. S.C. Health & Human Serv. Fin. Comm'n.*, 296 S.C. 373, 377, 373 S.E.2d 584, 586 (1988) (citation omitted).

In the case *sub judice*, the special referee found "it makes sense to give controlling weight to the handwritten provision." According to South Carolina jurisprudence, "[p]rinted provisions of a contract should be harmonized, if possible, with handwritten ones. If there is an inconsistency between the two provisions, however, the handwritten provision prevails." *Hawkins v. Greenwood Dev. Corp.*, 328 S.C. 585, 593, 493 S.E.2d 875, 879 (Ct.App.1997) (citing 3 *Corbin on Contracts* § 548 (1960)). Thus, the court did not err in finding the Addition took priority over the pre-printed terms of the Exclusive Agreement.

### II. Evidentiary Record

Although the special referee's order cites the witnesses' depositions rather than the trial transcript, all facts recited in the order are consistent with testimony given at trial and exhibits admitted into evidence. The first four machines were explicitly addressed by the written agreement.

R&B placed machines in thirteen additional stores without any additional written agreement. Because R&B paid West Oil a $500 placement fee each time a machine was placed and R&B split the proceeds from the machines in the manner specified by the contract, the court appropriately found the same terms of the written contract, including the handwritten termination clause, applied to the additional thirteen machines.

## *CONCLUSION*

"Courts are without authority to alter a contract by construction or to make new contracts for the parties." *Gilstrap v. Culpepper,* 283 S.C. 83, 86, 320 S.E.2d 445, 447 (1984). Our duty is to interpret the contract according to the intentions of the parties themselves " . . . regardless of its wisdom or folly, apparent unreasonableness, or failure to guard [the parties'] rights carefully." *Id.* (quoting *Blakeley v. Rabon,* 266 S.C. 68, 73, 221 S.E.2d 767, 769 (1976)). Because the record illuminates the parties' intent to include the handwritten termination provision as an additional term to the Exclusive Agreement, we hold the special referee properly construed the Addition so as to allow West Oil to terminate the contract at will.

We rule the parties' contract is ambiguous. Concomitantly, parol evidence is admissible to determine the parties' intent. The special referee correctly held the contract is ambiguous and looked to parol evidence to construe the contract. There is ample evidence to support the referee's decision that the parties intended for either to be able to terminate their agreement. The only monetary consequence for termination was the prorated repayment of the $500 placement fee, which the court ordered West Oil to pay R&B. Accordingly, the order of the special referee is

**AFFIRMED.**

HUFF and KITTREDGE, JJ., concur.